Good of you to join us, Mr. Winter. Good morning, Your Honor. First, let me address that, please. I do not have any justifiable reason for being tardy. I received notice last week, I read it, and I do not know why 10 o'clock remained in my brain. Last night, I was reviewing for arguments. I got up this morning, I reviewed for arguments, I did exercise, went out in the yard and practiced golf, left home and taking my time. I was out in the parking lot talking to someone. I was downstairs socializing because I was under the mistaken impression that I was to be here for 9.30 and arguments start at 10. And usually they do, but sometimes they change. I do not know, I am wondering why it is in my mind that it was 10. And even when I was sitting there and I'm saying, wow, I'm late, I'm saying, but I've been in arguments and I do not know what the reason is. But I sincerely apologize because I had all the time in the world to be here in time. Okay, well, I'm sure my colleagues join me in accepting the apology and we'll move on and hear the arguments. Your Honor, this case, years ago, back in 2002, a friend of mine, Esmond DeGrasse, called me. I was surprised when it was revealed to me the problem he was in. He indicated to me he was in Puerto Rico, incarcerated, and he wants to do a quick plea agreement that he can get out of jail. I notified the attorney for the government, Denise Hines, that my client is… A plea agreement, in fact, which was eventually reached and included a provision that reserved for the government the right to delay sentencing, right? Yes, Your Honor. I suggest that any delay should be reasonable, and it turned out that three and a half years' delay was unreasonable. Let's start with the period between the execution of the plea agreement, which was in September of 2002, and then the preparation or the finalization of the pre-sentence report, which was issued on May 28th of 2004. Would you agree that that period of time should not enter into the delay calculus? That is, that it's okay that there's no real objection you can have to that period of time? I can't agree to that. I'm an officer of the court, and it's easy to look back now. I believe, just as the way I forgot, I read that I was supposed to be in court. I read that last week, and I forgot the time. When we are talking about due process and the history of trying to get matters resolved because of loss of memory, Your Honor, I suggest that even that delay should be considered, and to have an extended delay is even more detrimental in some ways. Frankly, Judge, when I read certain things and I speak with my client, who was very, very active in this case, he reminds me of some of the things that happened. And whether it's because of age that I'm losing my memory, I hope not. But there are just so many things that were going on, and I suggest that there is no justifiable reason at any time for a person having to wait so long in order to be sentenced. You would agree, would you not, that we have to look to the test, the four-part test in Barker v. Wingo? Yes, Your Honor. Will you walk us through that test and tell us how you meet it? Your Honor, my brief addressed it, and I suggest that maybe the issue that you'd be looking at most is what demand have I made to speed up the process? Do you concede that you never requested a sentencing hearing, and that by doing that you've not asserted your speedy trial right in the district court? Yes, Judge, but as I said, that was briefed, and because I have not done that, as it states in the brief, does not mean that it was waived, Your Honor. All right, well, I'm not saying it was waived. Show me how you've met that part of the test. Judge, there is no option. If you did not request that the court schedule the sentencing hearing, how does that comport with the language from Barker v. Wingo, that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial? Your Honor, I could only rely on my argument stem, and in my argument, it says appellate did not clearly assert his right to a sentencing hearing. This does not determine whether the right has been violated. It would be inconceivable that the Constitution would extend protection to the citizen and then strip the citizen of that protection because he did not forcefully assert it. And I concede, Your Honor, that I did not forcefully assert it. My client was living in Georgia, and I – He was not incarcerated. He was not incarcerated. He was at liberty at all times prior to the sentencing, in fact, wasn't he? Yes, Your Honor. So you can't really – it's pretty difficult to meet the prejudice factor of Barker v. Wingo too, isn't it? Well, Judge, I think the prejudice is also addressed in my brief, and some of the prejudice is that during that time, he developed a business which he has since lost. He had a family and children that he was taking care of, and had he been sentenced immediately, he could have done the time and there would have been out that he could start the business. Instead, it's – it got to be prejudicial if you're going to start a business and your trucking business is doing good, and then three and a half years later, you're told, okay, now it's time for you to go. Mr. Wingo, two preliminary matters, one of which I neglected to touch upon because you were apologizing for your tardiness. Do you wish to reserve time for rebuttal? Yes, I had indicated when I read the notice as to the time. I also said three minutes reserved. Also, would you – you concede, do you not, that we're reviewing this claim for plain error because it was raised for the first time before this court? Yes, Your Honor. Your Honor, I rely on the brief. I think that the brief cover all the – Let's turn to the breach of the plea agreement issue then. Judge, procedurally what happened, my client indicated that he wanted to negotiate a plea agreement. I contacted Attorney Hines, and she indicated that she would like to debrief him. We all scheduled a date and time to be in Puerto Rico at the Guanabo prison, and that occurred. There was an agreement that was reached at that time. Certain problems happened, which I would want to slap myself, but at that time, I acted in good faith. There was no copying machine or any documents that were present in the jail. Was there a plea agreement signed? There was a plea agreement that was negotiated with the understanding that counsel will return to St. Croix and get me a final draft. But you eventually end up with an agreement that is signed. Your Honor, what happened, now that he is in Puerto Rico, we tried to get him from Puerto Rico. When that change of plea would occur was unknown. I received notice that he has been brought from Puerto Rico. At that time, the new agreement was not presented to me during the days between the period that I was in Puerto Rico and appearing in court. When I received notice that my client is in St. Croix, I need to get up to the district court. It's like you drop everything because the district court calls. Rushed up to the district court, handed a plea agreement, and I went and I sat with my client. We quickly reviewed the document. He signed it, and at that time, someone called, indicated the judge is waiting, the magistrate is waiting. Mr. Winter, let me ask you this as a practical matter. What's the difference between the agreement you contend was reached in principle or that somehow was not reduced to writing or whatever, and the agreement that your client eventually signs? We did not talk about 3.5 kilograms. It was 50 to 150. And the next thing is that the conspiracy charge was not a part of the agreement. Aside from that, there was certain conduct that occurred at Wendy's Restaurant. We never discussed that in Puerto Rico, and the record will show that my client was not even on the island during the occurrence of the Wendy's transaction. But this transaction attributed to the conspiracy and then allowed the sentencing to increase. And your client went through a guilty plea colloquy, and he pleaded everything consistent with the signed plea agreement. Yes, sir. After all his rights have been fully explained to him. Yes, Judge. It's on the record. But what is important, Judge, is that when my client, because that same day, one of the things, I mean, that everything, part of the agreement, after he entered his plea, he's going to be released. He's given a ticket, everything, and he's supposed to return to Georgia, which he did. He got a copy of the agreement. He calls me the Monday and indicated that there's a flaw in the agreement. I then, and he's not going along with it, I then contact Attorney Denise Hines, and we had a telephonic conference, and she indicated, don't worry, it will be straightened, etc. Years later, when we're going for, after the, for sentencing, and my client reviewed the plea sentence report, and he points out to me, because I overlooked it, honestly, he points out to me, remember we had the conference, and she said that it's not going to, don't worry about it. When I brought it to Denise, Attorney Denise Hines' attention, I think she told me that she couldn't remember the telephonic conference. We will hear from her. Your time's up, but you've reserved time for rebuttal, so we'll hear back from you also. Thank you. Good morning, sir. Denise Hines on behalf of the United States. Your Honor, if I can place this matter in context. This was an extremely complex case. It involved the charges, Hobbs Act charges, against Narcotics Strike Force, which is a local drug enforcement agency. There were prosecutions against multiple undercover officers. Multiple, including police officers, as well as correction officers, and several drug dealers. It resulted in an extended investigation, two trials, because the first trial ended in a threat against a juror, so it ended in a mistrial. And ultimately, the remaining two defendants were acquitted. During that period of time, as the court has well indicated, the defendant, in the plea agreement, which incidentally, was read to him during the plea colloquy. He indicated that he understood himself personally, and during his testimony in both trials, he indicated his understanding of the plea agreement. In the plea agreement, he specifically waived his right to a speedy sentencing, and therefore, it was a case that was extremely complex. And I'm assuming that he did that because he knew well the cooperation that lay ahead, and that he wasn't going to be sentenced quickly. Absolutely, Your Honor. That would be my understanding as well. And in fact, as the court has well pointed out, initially, when he pled guilty, he was allowed to be released to Florida, and was given notice to come back for each trial, which he did. And never at any time did he assert his right to a speedy trial. Assert his right to a sentence, I'm correct, to assert his claim that he wanted to be sentenced immediately. Never. It was only at the point where the sentencing was scheduled that the defendant, not even then, it was after he was sentenced, that he asserted on appeal that he wanted to assert his right to a speedy sentencing. Clearly, as this court has pointed out, the standard is plain error. The length of the delay is a factor to be considered by the court. Why did it take so long to actually get him to sentencing, though, after the pre-sentence report was issued? Well, Your Honor, there were several defendants that had to be sentenced. I believe the number was five that had to be sentenced, and they had to be sentenced in due time. Furthermore, the trial court that the trial judges sat in on this trial retired in December of 2005. The only remaining judge was recused from the case because he had been in the management of our office, and therefore there was no judge. The other remaining judge, Judge Finch, had recused himself early at the inception of the case. There was really no judge to sentence Mr. de Grasse. We have, though, a 22-month delay from the point of the PSR issuance to the actual sentencing date, correct? Yes, sir. Would you agree that that period of time, that kind of delay in sentencing, is presumptively prejudicial under Barker versus Winger, such that we then have to inquire into the other factors? I don't believe it's presumptively prejudicial. Why not? Because some of the cases I've come across, when there are complex cases such as U.S. versus Pemberton, which involved a 16-month delay, had delays that were as long or even longer if based upon the complexity of the case. Now, I recognize by this point the case was over. I understand that now we are, at this point after the pre-sentence report, in the sentencing phase. And I do agree that it is a factor that we should look closely at. However, I would also point the court's attention to the Burkitt case that suggests that in the absence of bad faith on the part of the government, and there is no demonstration of bad faith on the part of the government, and when you consider the length of the delay, the reason for the delay, as well as the fact that there was absolutely no prejudice to this defendant, we would ask that although there are clearly concerns about the length of the delay, that should not be the criteria that carries the day in the assessment of this case. In terms of the plea agreement, he indicated in the plea agreement that during the colloquy that it was read to him. He understood it. If we were to look at the difference between the unexecuted, quote, plea agreement, and keep in mind if the parties had come to a meeting of the minds in Puerto Rico, that plea agreement would have been signed. It does not have to be before a judge. We could have signed it there, but clearly that was not a final plea agreement. And if one were to look at the terms of the plea agreement, when the court asked the defense attorney, well, what were the terms of the plea agreement that you take issue with? And he indicated that there were a certain amount of kilograms indicated in the unexecuted plea agreement versus a certain amount of kilograms in the executed plea agreement that was different. However, what he neglected to tell the court was the kilograms that were referred to in the unexecuted plea agreement were crack cocaine. The sentence under both plea agreements, the unexecuted as well as the executed plea agreement, are identical. The defendant would enjoy no less time had he pled to the unexecuted plea agreement that he would have under the present plea agreement. And I would ask that the court allow the government to rely upon the brief that has been submitted in this case, which I believe has thoroughly, concisely, clearly, and completely filled out the facts in this case. And we'd ask that the district court determination be sustained. Thank you very much, Ms. Hines-Roach. Mr. Winter, rebuttal? Two points I'd like to make out because I'll point out to you that Attorney Hines, to this date, has not addressed what happened in Puerto Rico. I suggest Attorney Hines – Is it in the record? Is there anything in the record as to what happened in Puerto Rico? There is nothing in the record other than what we have stated.  Okay. But I suggest that there was a full agreement reached in Puerto Rico. What happened, the proposed agreement was scratched up, etc., that she had taken to Puerto Rico. And we did not have the facilities or the capability to make copy or to do a final draft in the prison. So it was supposed to be done and presented to me in St. Croix. Ms. Hines has said that if there is a difference, there would be no difference in the sentence imposed. Do you disagree with that? Yes, I disagree with it because we never agreed to a conspiracy, and I think that there are substantive charges that it – You never agreed to a conspiracy? The district court did not colloquy on that? Yes, and you have to look at the facts and circumstances. Took your client through the elements of conspiracy during the guilty plea colloquy? Yes, and my client – Your client indicated that he understood them and that he pled guilty to them? And my client – yes, Your Honor, I'm in agreement with that. However – As one of our colleagues would say, game, set, and match. However, he called Attorney Hines, and we spoke to Attorney Hines about a month later after calling her and telling her, no, my client is not going through with it, etc. That is about a month after the change of plea. And we had a telephonic conference, and this is what I'm – you know, and she indicated, don't worry about it. She's going to take care of it. When the time came for her to take care of it, she never did. And that is what my client is upset about because of the fact that the Wendy's was never discussed, and also there was never – no conspiracy was discussed. Thank you. The case was never raised at the sentencing? Yes, it was raised at the sentencing because we had filed a motion to withdraw the plea agreement and went back and forth, and my client finally instructed me to go forward because he was under the impression that the judge would not set it aside, and then he would incur the wrath of the judge. And I think he still incurred the wrath of the sentencing judge because the government recommended 44, and the judge imposed 48, I think. So he still incurred that wrath. Thank you. Thank you very much. Thank you to both of the counsel. We will take the matter under advice.